MARY QUICK, Appellant, v. M. L. TURNER, Respondent.

St. Louis Court of Appeals, May 3, 1887.

1. EVIDENCE—ORAL.—It may be shown by oral evidence that a deed or an assignment, purporting to be absolute, is a mere pledge or mortgage.

2. ———— In such a case, the oral evidence must be clear and consistent; and, if it be such that a chancellor could not, on the strength of it, declare the conveyance to have been a mere pledge or mortgage, the court commits no error in refusing to submit the evidence to the jury.

APPEAL from the Greene County Circuit Court, JAMES R. VAUGHAN, Judge.

*Affirmed.*

MASSEY & McAFEE, for the appellant: There was evidence tending to establish the issues for the plaintiff as fully as claimed by her. It was, therefore, error in the court to instruct the jury to find for the plaintiff, only and just the sum admitted by the defendant to be due. *Smith v. Hutchison,* 83 Mo. 683; *Groll v. Tower,* 85 Mo. 251, and authorities on that page cited.

GOODE & CRAVENS, for the respondent.

THOMPSON, J., delivered the opinion of the court.

The question which arises upon this record is, whether, under the allegations of her petition, the plaintiff submitted evidence sufficient to take her case to the jury. At the close of her evidence, the court directed a verdict for her, in conformity with the facts set up *in the defendant's answer,* and she has brought the case here by appeal.

Her petition states " that, on the first day of Janu-

ary, 1885, she was the owner of a certain promissory note, executed to her by Lizzie M. and J. F. Buffington, for the principal sum of eight hundred and thirty-four dollars, dated January 1, 1885, payable eighteen months after date, for value received, with interest, from date, at the rate of eight per cent. per annum; that, on the twenty-fifth day of May, 1885, the plaintiff borrowed of the defendant the sum of one hundred and twenty-five dollars, and, for the purpose of securing the same, she, by her writing, on the back of said note of Lizzie M. and J. F. Buffington to her, herein described, indorsed and assigned the same to the defendant; that the defendant, at that time, viz: May 25, 1885, took said note, and agreed to and with the plaintiff that, when said note should be paid, he, the said defendant, would repay himself said one hundred and twenty-five dollars, and would pay the balance collected on said note to the plaintiff; that, on the fifth day of March, 1886, the defendant collected the whole amount due on said note of Lizzie M. and J. F. Buffington to the plaintiff, to-wit, the sum of $926.75, and that the plaintiff demanded, on that day, of said defendant, the balance of said note, after retaining the said sum of one hundred and twenty-five dollars, to repay the defendant his debt as aforesaid, to-wit: the sum of eight hundred dollars, and the defendant refused, and still refuses, to pay the same to the plaintiff; wherefore, the plaintiff prays judgment against the defendant for the sum of eight hundred dollars.''

The answer, after a general denial, runs in the following language:

''The defendant, for another answer to the plaintiff's petition in the cause above entitled, states that, on or about the eighteenth day of April, 1885, the above-named plaintiff, Mary Quick (but then named Mary Hopkins), borrowed from the defendant the sum of $801.75, and executed to the defendant her note therefor, due in thirty days; that, as security for the payment of

said note, said Mary Hopkins pledged to the defendant two promissory notes, signed by Lizzie M. Buffington and John F. Buffington, and secured by a second mortgage on a lot of household furniture contained in the Central hotel, in Springfield, Missouri; that one of said notes, so pledged to the defendant as security for said note executed to him by Mary Hopkins, was for the sum of eight hundred and thirty-three dollars, and the other was for the sum of eight hundred and thirty-four dollars.

"That, thereafter, and in about thirty days from said transaction, the said note of said Mary Hopkins to the defendant falling due, and she being unable to pay the same, she sold, assigned, and delivered said notes, signed by Lizzie M. and John F. Buffington, to the defendant, for which the defendant released the plaintiff from the amount which the said Mary Hopkins owed him, and paid her the further sum of one hundred and twenty-five dollars, and agreed to pay her the further sum of one hundred and forty-eight dollars, if said Buffington notes were paid at or before maturity.

"The defendant further states that said two notes were paid before maturity, and the defendant owes the plaintiff, Mary Quick, therefore, the sum of one hundred and forty-eight dollars, which he has been at all times ready and willing to pay, and now tenders to the plaintiff, and has, heretofore, tendered to the plaintiff, with interest and costs.

"Wherefore, the defendant prays to be discharged, with his costs."

The new matter set up in the answer was denied by a reply. The plaintiff, being sworn as a witness in her own behalf, was shown the following notes:

"$834.                SPRINGFIELD, Mo., Jan. 1, 1885.

"Eighteen months after date, I promise to pay to the order of Mary Hopkins, eight hundred and thirty-four dollars, for value received, negotiable and payable without defalcation or discount, and with interest, from

date, at the rate of eight per cent. per annum ; and, if the interest be not paid annually, to become as principal, and bear the same rate of interest.

"No. 8, due July 1, 1886.      Lizzie M. Buffington,
            "J. F. Buffington."

" (Endorsements on note).

"2227—Buffington—834—Due  July 1, 1886—Mrs. M. Hopkins—Springfield, Mo., 5,—25,—85—For value received I assign this note to M. L. Turner, and mortgage securing it, and waive demand, protest, and notice, Mrs. M. Hopkins.  I guarantee the within note to be paid when  due.  L. R.  Peebles—Paid  $10.00  by  L. R. Peebles this January 4, 1886—Pay Ex. Bk. or order. M. L. Turner—."

"$833.          Springfield, Mo., Jan. 1, 1885.

" One year after date I promise to pay to the order of Mary  Hopkins, eight hundred and thirty-three dollars for value received,  negotiable and payable without defalcation or discount, and with  interest from date at the rate of 8 per cent. per annum, and if the interest be not paid  annually to become  as principal and bear the same rate of interest.

"No. 7.  Due Jan. 1, 1886.      Lizzie M. Buffington,
            " J. F. Buffington."

"Endorsements,

"Mrs. M. Hopkins, Springfield, Mo., 5,—25,—85.

"For value  received I assign  this  note, and  mortgage securing it, to M. L. Turner, and waive demand, protest, and notice—Mrs. M. Hopkins—Paid by L. R. Peebles,— M. L. Turner."

She then continued her testimony as follows :

" I am the person named as  payee in said notes.  I had placed these notes in the bank at North Springfield, Missouri.  I owed the bank  eight hundred dollars, and had placed with  the bank  these two notes of eight hundred and thirty-four dollars and eight hundred and

thirty-three dollars, together with the chattel mortgage which secured them, as collateral to secure the payment of my eight hundred dollar note to the bank. I spoke to Mr. W. S. Thompson about making arrangements to meet my note, and he brought the defendant, Mr. Turner, to the Central Hotel to look at the furniture which was mortgaged to secure the said Buffington notes, with the view of my getting money of him. Mr. Turner looked at the furniture, and then went away, and said he would let me know in a day or two. Afterwards, Mr. Turner went with me to the bank at North Springfield, and paid my eight hundred dollar note there, and I gave him my two Buffington notes, with the chattel mortgage securing same, as collateral for the eight hundred dollars he loaned me in the bank, and I gave him my note for eight hundred and nine dollars, I think, payable in thirty days; this was about the fifteenth day of April, 1885. I said to Mr. Turner that, 'I expected you were going to make that ninety days as the other was', and I told him I had nó way of paying him until these Buffington notes became due. I think he said he must have it; that was all that occurred at that time.

"I had no further conversation with him until about May 15, 1885, when I saw Mr. Turner. I then wanted to borrow some money on this eight hundred and thirty-four dollar note of Buffington to me, as I knew the first note of eight hundred and thirty-three dollars belonged to him—in this way : I knew it would take that note to pay my note of eight hundred and nine dollars to him. When I went to him to borrow some more money, he said he couldn't let me have it; this was about the first of May, 1885.

"Afterwards, about the twenty-third of May, 1885, he came to the Southern Hotel where I was, and called for me. I came up and he said to me, 'I'll let you have one hundred and twenty-five dollars; this is all I can let you have now.' He asked me to sign my name

on the back of the note; I did so, on this eight hundred and thirty-four dollar note, and in regard to what is written on the back of this note, I don't understand that. Can't say whether it was there or not then; he never mentioned the sale to me, and I don't understand it as such. He said he was in a great hurry, and he seemed to be, and that he would be back in a few days and let me have one hundred and forty-eight dollars more; I never knew what the one hundred and forty-eight dollars was intended for. He never explained it to me. He said, 'I will do what is right,' and went down stairs, and went away, and that was all that occurred. He never paid me any other money on said note than I have stated. I demanded more money of him. I heard he was going to Kansas, and I thought I would tender him his money back and get my note back. I had not seen him from May, 1885, until February, 1886. I went, in February, 1886, to Marshfield to see him, met him at the depot. He asked me if Peebles came, said that he was not looking for me, that he expected to meet Peebles, and was looking for him, but not for me ; said that he had to leave on that train for Lebanon, and left.

"This was all that occurred there ; said he would be back that evening. I went to the hotel, but he didn't come back, didn't see him again that trip, didn't see him again until about the last of February, 1886, and then saw him at the Central Hotel. I then told him I wanted to pay him what I owed him and get my notes back. He said he didn't owe me anything. This was all then; afterwards I saw the card to Peebles saying that he, Turner, was going to Kansas. I asked him once more for money, he said he didn't owe me. I went to Marshfield a second time and saw Mr. Turner, and he then said the notes were in Springfield, and he would be in Springfield next day; this was about the last of February, 1886.

"I never had these two notes in my possession from the time I first delivered them to Turner until after they

had been paid. The one hundred and twenty-five dollars was all I ever got on that last note."

On cross-examination, the witness said: "I told Turner I wanted to pay him what I owed him and get my note back. At that time I owed him one hundred and twenty-five dollars with interest; that was in February, 1886; I didn't pay him the eight hundred and nine dollar note I gave him. Mr. Peebles paid the note for me, paid it in bank for Turner. I never asked Mr. Turner for the balance of the eight hundred and thirty-three dollars above the eight hundred and nine dollar note; I supposed the interest amounted to something. I got back the thirty days note that I executed to him. I think Mr. Turner gave it to me at the time he gave me the one hundred and twenty-five dollar check. He had then been paid the eight hundred and nine dollar note by Mr. Peebles.

"I got the thirty day note in May, 1885. The first Buffington note had not then been paid by Mr. Peebles. My deposition has been taken in this cause; I then swore I did not get back my thirty day note when I got the one hundred and twenty-five dollar check. I was mistaken. At the time Turner gave me the one hundred and twenty-five dollar check he gave me the thirty day note, but I did not know what it was at that time; he did not explain. I never did demand any money of Mr. Turner. I only said I wanted to pay him what I owed him and get my note back, and he always said he wanted to do what was right. I heard he was trying to dispose of the note, and I demanded it of him. At the time he gave me the check for one hundred and twenty-five dollars, I did not endorse both of the Buffington notes. I think at that time I endorsed but one. I am pretty positive that all this writing was not on the note then. My signature is twice on both the notes. I can't remember endorsing the second time on but one note. I remember that I endorsed one of the notes to him the day I got the one hundred and twenty-five dollars from him;

but don't remember whether I endorsed the other one the same day or not; don't think I did. I can't explain why I wrote the second endorsement on the other note, unless it was when I endorsed it, the other, at the Springfield Bank.

"I know that Mr. Peebles did not pay the first note of Buffington's until about the first of January, 1886. I mean to say that Mr. Peebles assumed my thirty day note and paid it on the first of January, 1886. Mr. Turner gave my note back to me in May, 1885, the same day I got the check for one hundred and twenty-five dollars. I never understood that I sold these notes to Mr. Turner."

Another witness for the plaintiff testified that he was acquainted with the value of money in the city of Springfield, in the year 1886, and that it was worth ten per cent. per annum. This was all the evidence offered at the trial. Thereupon the court instructed the jury to find the issues for the plaintiff, and assess her damages at one hundred and forty-eight dollars.

It has long been the law in this state that a bill of sale, absolute on its face, may be shown, by parol evidence, to have been intended merely as a security for money lent (*Johnson v. Huston*, 17 Mo. 58; *Foster v. Reynolds*, 38 Mo. 557); and while it was held in two cases, decided before the passage of our present practice act, which blends legal and equitable remedies, that parol evidence is not admissible, in an action *at law*, to show that a deed (*Hogel v. Lindell*, 10 Mo. 483), or bill of sale (*Montany v. Rock*, 10 Mo. 506), absolute on its face, was intended as a mortgage; yet, since our present practice act, although the rule of these last two cases was conceded in *Johnson v. Huston* (17 Mo. 53), it has been regarded that the rule which allows a person to show that an absolute deed of conveyance of a bill of sale was intended merely as a security for money lent, is a rule of evidence which may be invoked, even in what would have been termed, under the old system, an action at law. We

have, at least, one recent decision of our supreme court which applies this rule in an action at law, upon facts strikingly similar to those which are exhibited by the present petition. In *Wood v. Matthews* (73 Mo. 477, 481), the action was an action at law to recover the balance of the amount of a promissory note alleged to have been assigned by the plaintiff to the defendant, as collateral security for an advance of money, after allowing the defendant credit for the money thus advanced. The plaintiff recovered a judgment, which was affirmed by the supreme court upon the, defendant's appeal. One of the questions which the supreme court decided, was, that the trial court did not err in admitting parol evidence, submitted by the plaintiff, tending to show that the note was endorsed and delivered to the defendant as collateral security merely—the court simply re-affirming, and applying the rule of *Johnson v. Huston* (17 Mo. 58), that " it is admissible to prove that a bill of sale, of any species of property, or a deed to real estate, although absolute on its face, was intended as a mortgage." Upon the authority of that case, the evidence of the plaintiff in this case was clearly admissible, to explain the purpose of the assignment on the back of the note.

But we are, nevertheless, constrained to hold that her evidence failed to make out a case upon which, under the allegations of her petition, she was entitled to go to the jury. In order that her evidence should have this effect, it was necessary that it should, consistently with the allegations of her petition, explain away the effect of her written assignment on the back of the note, which clearly operated as a transfer of the title to the defendant. This assignment must, if she understood what she was doing—if she was capable of contracting, and she does not plead that she was not— have meant something more than to transfer title to him for some limited purpose ; for her naked endorsement would have been sufficient for that, and her endorse-

ment, made at a previous date, was already upon each note. These written assignments are, therefore, distinct evidence in support of the allegations of the answer, that the plaintiff assigned, and delivered, the note to the defendant, in consideration of his releasing her from the obligation of her note for $801.75, which was then due, and in consideration of his paying her the further sum of one hundred and twenty-five dollars, and agreeing to pay her the further sum of one hundred and forty-eight dollars, if the notes should be paid before maturity. Now, instead of an agreement for an absolute sale of both notes, which her assignments plainly import, she sets up in her petition that the defendant agreed to hold the eight hundred and thirty-four dollar note, as collateral security for the advance of one hundred and twenty-five dollars. But she nowhere distinctly states, in her testimony, that this was the agreement. While, as we hold, parol evidence was competent to show that the assignment, though absolute in its terms, was intended only as a contract or pledge ; yet, in order thus to change its legal import, it was necessary for her to give distinct evidence that such was the agreement. She does not give such evidence. A court of equity could not, on such evidence as she gives, change an absolute assignment into a pledge, and, for reasons quite as strong, a jury ought not to be allowed to do so. The court, therefore, committed no error in refusing to submit the case to the jury.

With the concurrence of Rombauer, J., the judgment will be affirmed. Lewis, P. J., is absent.